594 S.E.2d 462

**Joseph R. SHEPPARD, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 25796.

Supreme Court of South Carolina.

Submitted Jan. 22, 2004.

Decided March 22, 2004.

648

650

Senior Assistant Appellate Defender Wanda H. Haile, of Columbia, for petitioner.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Chief Capital and Collateral Litigation Donald J. Zelenka, Assistant Deputy Attorney General Allen Bullard, and Assistant Attorney General Christopher L. Newton, all of Columbia, for respondent.

Justice MOORE:

We granted this writ of certiorari to determine whether the post-conviction relief (PCR) court erred by denying petitioner's request for a belated appeal. We reverse the PCR court and, after a review of petitioner's direct appeal issues, we affirm his convictions for murder and possession of a firearm during the commission of a violent crime.

## PROCEDURAL FACTS

Petitioner was convicted of murder and possession of a firearm during the commission of a violent crime and received consecutive sentences of life imprisonment for murder and five years on the firearm charge. No direct appeal was taken. Thereafter, petitioner filed a PCR application seeking a belated review of his direct appeal issues pursuant to *White v. State*, 263 S.C. 110, 208 S.E.2d 35 (1974). Following the *White* hearing, the PCR court issued an order finding petitioner was not entitled to a belated review of his direct appeal issues.

### Post–Conviction Relief Issue

Did the PCR court err by failing to grant petitioner a belated review of his direct appeal issues?

## DISCUSSION

Petitioner contends the PCR court erred by finding he voluntarily waived his right to a direct appeal because trial counsel misadvised him that if his convictions were reversed on appeal, the State could again seek the death penalty.

To waive a direct appeal, a defendant must make a knowing and intelligent decision not to pursue the appeal. *Davis v. State*, 288 S.C. 290, 342 S.E.2d 60 (1986). The Court will reverse a PCR court's decision when it is controlled by an error of law. *Pierce v. State*, 338 S.C. 139, 526 S.E.2d 222 (2000).

Petitioner was convicted of murdering a Greenville city police officer. During the sentencing hearing, the State introduced evidence of only one aggravating circumstance, that the victim was a law enforcement officer killed during the performance of his duties. *See* S.C.Code Ann. § 16–3–20(C)(a)(7)

(2003). The jury found the aggravating circumstance was present, but recommended life imprisonment instead of death.

At the *White* hearing, petitioner testified he called trial counsel's office the day after his trial and told counsel to appeal his case. Counsel met with petitioner and told him it would be unreasonable to file an appeal because the State could seek the death penalty again if he was granted a new trial. Based on counsel's advice, petitioner did not file a direct appeal. Trial counsel confirmed the facts as stated by petitioner. Counsel testified, however, that he believed, and continues to so believe, the State would do everything to execute petitioner, including attempting to have a pertinent United States Supreme Court case overturned.

█ The general rule in capital punishment cases is that when a defendant's conviction is reversed on appeal, the original conviction is nullified and the slate is wiped clean. *Gill v. State*, 346 S.C. 209, 552 S.E.2d 26 (2001). If the defendant is convicted again on retrial, the death penalty may be validly imposed. This doctrine is known as the clean slate rule and was enunciated by the United States Supreme Court (USSC) in *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), and *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

In *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the USSC recognized a limited exception to the clean slate rule—when a jury or appellate court finds the prosecution has failed to "prove its case" for the death penalty, and a life sentence is imposed, the clean slate rule does not apply, and the State cannot seek a harsher sentence upon retrial. *Id.* The USSC held that where the first jury returns a unanimous verdict of life imprisonment, the Double Jeopardy Clause of the Fifth Amendment bars the imposition of the death penalty on retrial. The first jury, by choosing life, impliedly decides the prosecution has not proved its case for death, and impliedly acquits the defendant of the death penalty. According to *Bullington*, the clean slate rule is inapplicable whenever a jury agrees or an appellate court decides the prosecution has not proved its case.

Under South Carolina's sentencing scheme, there are three possible outcomes following the jury's determination that a

statutory aggravating circumstance is present: (1) the jury recommends death and the trial judge imposes death; (2) the jury fails to recommend death and the trial judge imposes life without parole; or (3) the jury is deadlocked as to whether death should be imposed and the trial judge imposes a sentence of life imprisonment. S.C.Code Ann. § 16-3-20 (2003).

█ In the instant case, the sentencing jury found the presence of a statutory aggravating circumstance and failed to recommend death. Therefore, counsel's advice that petitioner would face the death penalty was erroneous given the jury's actions constituted an acquittal of the death penalty under *Bullington, supra*. Although counsel testified he believed the State would attempt to overturn *Bullington*, counsel's speculation about what the State would argue is not a sufficient justification for his failure to correctly explain the law or effectively convey to petitioner that his advice was based on speculation about the State's strategy, rather than the law. Further, petitioner desired to file an appeal, but chose not to after counsel informed him he could face the death penalty if he was retried. Accordingly, the PCR court erred by finding petitioner voluntarily waived his right to a direct appeal.

## Direct Appeal
## FACTS

On the day of the crime, Officer James Russell Sorrow attempted to arrest petitioner pursuant to a felony warrant. The officer eventually chased petitioner into the home of petitioner's aunt, Nancy Workman. The officer cornered petitioner and attempted to place handcuffs on him. Petitioner was able to escape from the officer and another chase ensued. Subsequently, petitioner shot the officer two times in the face, four times in the back of his head, and once in the buttocks. The officer died as a result of his wounds. Petitioner was captured a few days later at a local motel. He was charged with murder and possession of a firearm during the commission of a violent crime. After a trial, the jury convicted petitioner of both charges.

## ISSUE I

Did the trial court err by denying petitioner's motion for a change of venue due to pretrial publicity?

## DISCUSSION

 Petitioner argues his motion to change venue should have been granted due to the nature of the crime, *i.e.* a "cop killing," and due to the large percentage of potential jurors that were aware of the media coverage. He argues this established inherent prejudice because the case was easily remembered.

During voir dire, the trial court asked eighty-seven prospective jurors whether they had been exposed to pretrial publicity. Out of eighty-seven potential jurors, all but five had been exposed to pretrial publicity. The trial court then asked these prospective jurors whether they had formed an opinion about the case and whether they could put aside what they had heard and base their verdict on the evidence presented at trial. Fourteen of the prospective jurors indicated they had formed an opinion that petitioner was guilty. Out of those fourteen, eight prospective jurors stated they could not set it aside. Of the eight who said they could not set it aside, only one of these was qualified to be in the pool from which the jury would be empanelled.[1] This person was not seated on the jury.[2]

The trial court denied petitioner's motion for a change of venue based on excessive pretrial publicity. The court stated pervasive pretrial publicity alone was not sufficient to relocate the trial. The court concluded the jury pool, after being subjected to extensive voir dire, was fair and impartial.

 A motion to change venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. *State v. Manning*, 329 S.C. 1, 495 S.E.2d 191 (1997) (finding trial court abused

1. Out of the fourteen who said they had formed an opinion petitioner was guilty, six persons stated they could set that opinion aside for trial. Of those six persons, one was empanelled as an alternate on the jury.

2. The jury that was empanelled consisted of eleven people who had been exposed to the pretrial publicity and had not formed an opinion as to petitioner's guilt. One person had not been exposed to the publicity. The three alternates consisted of two people who had not formed an opinion from the publicity and one person who had formed the opinion that petitioner was guilty but that person stated he could set that opinion aside.

discretion by granting State's motion to change venue based on pretrial publicity because no evidentiary facts supported finding of actual juror prejudice toward State). When a trial judge bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate voir dire examination of the jurors, his decision will not be disturbed absent extraordinary circumstances. *State v. Caldwell*, 300 S.C. 494, 388 S.E.2d 816 (1990). When jurors have been exposed to pretrial publicity, a denial of a change of venue is not error when the jurors are found to have the ability to set aside any impressions or opinions and render a verdict based on the evidence presented at trial. *State v. Manning, supra.* Therefore, mere exposure to pretrial publicity does not automatically disqualify a prospective juror. *Id.* Instead, the relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant. *Id.* It is the defendant's burden to demonstrate actual juror prejudice as a result of such publicity. *State v. Caldwell, supra.*

The trial court properly denied petitioner's motion for a change of venue because petitioner did not show extraordinary circumstances why this decision should be disturbed given the adequacy of the voir dire examination of the jurors. *See State v. Caldwell, supra.* The potential jurors' mere exposure to the pretrial publicity did not automatically disqualify them. *See State v. Manning, supra.*

Petitioner has not met his burden of demonstrating actual juror prejudice as a result of the publicity. *See State v. Caldwell, supra* (no abuse of discretion where eleven of seated jurors and two alternates acknowledged awareness of media coverage but stated they could be impartial and decide case based on evidence presented). His mere assertion he established inherent prejudice due to the nature of the crime and the large percentage of prospective jurors who remembered the case is insufficient to show actual prejudice. *See State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998) (defendant's mere assertion that jurors could have been subconsciously affected by media exposure is insufficient to show prejudice). Although there was intense pretrial media coverage, there was no indication the trial court's voir dire failed to produce an impartial jury. *See id.*

Accordingly, the trial court did not err by denying the motion to change venue due to pretrial publicity.

## ISSUE II

Did the trial court err by denying the motion to quash the indictment because racial discrimination existed in the county grand jury selection process?

## DISCUSSION

Prior to trial, petitioner moved to quash the indictment because there was racial discrimination in selecting and seating jurors for the Greenville County grand jury. For purposes of the motion, it was assumed by all parties that the African American population in Greenville County was about 16–18%. At the request of the trial court, the county clerk compiled information regarding the race of the grand jurors for the years 1994 to 1997. The clerk was also questioned by the court and testified the selection procedures for the grand jurors had not deviated from the law. The trial court denied the motion and stated petitioner had not established a presumption of racial discrimination based on the statistical data available.

In *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the United States Supreme Court outlined the following test to be utilized when a defendant makes a grand jury discrimination claim:

[I]n order to show ... an equal protection violation[,] ... [t]he *first* step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Next,* the degree of under-representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... *Finally,* ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial under-representation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*State v. George,* 331 S.C. 342, 503 S.E.2d 168 (1998), *cert. denied,* 525 U.S. 1149, 119 S.Ct. 1050, 143 L.Ed.2d 55 (1999) (quoting *Castaneda,* 430 U.S. at 494–95, 97 S.Ct. 1272) (emphasis added by *George* ).

Under the *Castaneda* test, petitioner satisfied the first element of belonging to a group that is a recognizable, distinct class, *i.e.* African American. The second element of the *Castaneda* test is that the degree of under-representation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.

In 1994, 13.6 % of the seated grand jurors, including alternates, were African Americans. In 1995, 15.7% were African Americans. In 1996, 23% were African Americans. In 1997, 21% were African Americans. Given the Greenville County African American population was assumed to be 16–18% at trial, these statistics do not indicate racial discrimination in the composition of the grand jury. Therefore, petitioner cannot meet the second element of the *Castaneda* test.

Accordingly, petitioner has not made a prima facie showing under the *Castaneda* test, and, as a result, the trial court did not err by denying petitioner's racial discrimination claim.

## ISSUE III

Did the trial court err by denying petitioner's motion for a mistrial due to the State's failure to submit witness statements to the defense?

## DISCUSSION

Petitioner argues the trial court erred by denying his motion for a mistrial due to the State's failure to produce two prior statements of Reggie Cole until the conclusion of the State's direct examination of the witness.[3] Petitioner argues

---

3. Petitioner also argues the State failed to produce two prior statements of Nancy Workman until the conclusion of Workman's direct testimony. However, Workman's statements were not included in the record. Accordingly, the State's failure to produce Workman's statements to petitioner will not be considered. *See* Rule 210(h), SCACR ("Except as provided by Rule 212 and Rule 208(b)(1)(C) and (2), the appellate court

the State's failure to produce the statements violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

As noted previously, following a chase in petitioner's neighborhood, a struggle in Nancy Workman's home, and another chase, petitioner shot Officer Sorrow six times in the head. Petitioner's forensic expert testified on his behalf that the evidence of the two gunshot wounds to the officer's face was consistent with the position of defendant being held by the neck and reaching his gun over and shooting the officer, which coincided with petitioner's testimony at trial.[4]

Reggie Cole, who was charged with accessory after the fact of murder for allowing petitioner to stay in his home and acquiring a hotel room for petitioner, testified for the State at trial. Cole testified petitioner admitted the officer was chasing him and that after petitioner exited Workman's home, the officer told petitioner to freeze. Petitioner did so and raised his hands. When the officer holstered his gun and pulled out the handcuffs, Cole testified petitioner stated he said "Man, I can't go to jail" and he made a motion indicating he shot the officer. This testimony conflicted with petitioner's testimony of how the shooting occurred. *See* footnote 4 *infra.*

Cole gave two statements to the police, one a week after the crime and one almost a month after the crime. In the first statement, Cole did not relate the alleged statements petition-

will not consider any fact which does not appear in the Record on Appeal.").

Further, although counsel was given Workman's prior statements before cross-examination commenced, counsel did not question Workman as to those statements. When defense counsel brought to the court's attention that the State had failed to timely produce the statements, the court informed defense counsel that Workman could be recalled for whatever purpose counsel desired. Defense counsel did not recall Workman to testify.

4. Petitioner testified, the second time he fled from the officer, the officer was not chasing him and so he hid behind a barn. He then saw the officer running down the street and he assumed the officer was gone. Suddenly, an unknown person choked him from behind. He could not get the person to stop choking him so he reached in his back pocket, retrieved his gun and shot two times. He testified he was still being choked and when he finally got the person off of his neck, he turned around and shot without trying to see who had been choking him. He shot until his gun was empty. He testified he then realized he had shot the officer.

er made about the killing. Later, Cole's attorney advised him it would be to his benefit to tell everything he knew. As a result, Cole made another statement and this statement correlated with what he testified at trial.

Prior to cross-examining Cole, defense counsel alleged a *Brady* violation had occurred because the State had failed to produce Cole's statements until after the State had completed its direct examination of Cole. Defense counsel asked the court to consider the appropriate sanction because petitioner's right to impeach the witness was impeded. Defense counsel noted they would have liked the opportunity to investigate Cole's second statement because, in that statement, Cole indicated he had been at a bar for several hours before petitioner allegedly told him about how the shooting occurred. Defense counsel wanted to determine how intoxicated Cole was at the time. The State countered, as to the second statement, that it had been read into the record at the preliminary hearing so defense counsel had advance notice of that statement. The court reserved ruling until after the testimony was proffered.

Following the proffer of Cole's testimony, the court found Cole's statements were not within *Brady* and that the new information did not amount to impeachment on issues that were substantive or germane to the issues in the case. During the cross-examination before the jury, Cole admitted he was intoxicated at the time he allegedly heard the statement by petitioner and he agreed that drinking could affect a person's ability to recall the details of a conversation.

Pursuant to *Brady*, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Duncan v. State*, 281 S.C. 435, 315 S.E.2d 809 (1984). A *Brady* claim is complete if the accused can demonstrate (1) the evidence was favorable to the accused, (2) it was in the possession of or known to the prosecution, (3) it was suppressed by the prosecution, and (4) it was material to guilt or punishment. *Gibson v. State*, 334 S.C. 515, 514 S.E.2d 320 (1999). This rule applies to impeachment evidence as well as exculpatory evidence. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

▆▆▆▆▆▆▆▆▆▆

▆▆▆ Favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley, supra; State v. Hinson,* 293 S.C. 406, 361 S.E.2d 120 (1987). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

▆▆▆ Petitioner has not established a *Brady* claim. The prosecution did not suppress the evidence because Cole's second statement, which related what petitioner allegedly told Cole, was read into the record at the preliminary hearing. Further, the contents of the statements the State initially failed to produce do not create a reasonable probability that the outcome of the proceeding would have been different had the information been disclosed. *See State v. Thompson,* 276 S.C. 616, 281 S.E.2d 216 (1981) (State's failure to disclose does not warrant reversal unless defendant deprived of fair trial).

Petitioner had the opportunity to review and use the inconsistent statements in his cross-examination of Cole. *Cf. Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (*Brady* violation where prosecution failed to disclose, until collateral review of Kyles' conviction, various statements, made to police by informant who did not testify at trial, that showed informant could have been actual perpetrator of the crime). During cross-examination, defense counsel acquired an admission by Cole that he was intoxicated at the time petitioner allegedly made the statements. However, he chose not to impeach Cole any further with his previous inconsistent statements. Given the fact he was given Cole's statements in time for cross-examination, there is not a reasonable probability the outcome of the trial would have been different had the statements been disclosed prior to trial.

Accordingly, the trial court did not err by denying petitioner's *Brady* claim.

### ISSUE IV

Did the trial court err by allowing hearsay testimony?

### DISCUSSION

Petitioner argues the court erred by allowing Melinda Lynch to testify regarding statements she overheard petitioner make a few days before he killed the officer.

Lynch testified at trial that a few days before the officer was killed, she overheard petitioner talking with his friends. At this point, petitioner made a hearsay objection. Lynch

testified *in camera* she heard petitioner say there was a warrant for his arrest and that "before I let an MF, mother fucker cop take me down, police take me down I will shoot and kill one of the SOB's." Lynch testified she told petitioner that no one has a right to kill another person. Petitioner then stated, "fuck that, before I let them take me down I will shoot and kill one of the SOB's." [5]

The court, citing Rule 803(3), SCRE,[6] ruled the statements were admissible as a clear exception to the hearsay rule, and that the statement was relevant. Lynch repeated her testimony in front of the jury.

Petitioner argues Lynch's testimony is inadmissible hearsay and does not fall into the category of nonhearsay as set out in Rule 801(d)(1)(A), SCRE.

Rule 801(d)(1)(A) provides that a statement is not hearsay if the declarant [7] testifies at the trial and is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony. Due to the State's admission of Lynch's testimony during its case, petitioner is correct that the statement is *not* nonhearsay under Rule 801(d)(1)(A). While the declarant, *i.e.* petitioner, testified at the trial and was subject to cross-examination concerning the statement and the statement was inconsistent with petitioner's testimony that he unintentionally killed the officer, the State offered Lynch's testimony *prior* to petitioner's testimony. Accordingly, Rule 801(d)(1)(A) is inapplicable.[8]

---

5. Later, in his direct testimony, petitioner denied making the statements and denied he saw Lynch. Thereafter, on cross-examination, petitioner testified Lynch may have overheard something he and his friends were talking about.

6. Rule 803(3) provides that a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design) is excluded from the hearsay rule, even if the declarant is available as a witness.

7. "Declarant" is defined as a person who makes a statement. Rule 801(b), SCRE.

8. If the State had cross-examined petitioner and obtained a denial that he made the statement, the State could have admitted Lynch's testimony in its reply as nonhearsay under Rule 801(d)(1)(A).

*See State v. Anders,* 331 S.C. 474, 478, 503 S.E.2d 443, 444, n. 3 (1998) (error in admitting declarant's prior inconsistent statement without declarant first taking stand and denying having made it is not cured when declarant is subsequently called as witness by defendant; once declarant's statement was introduced by State, declarant has little alternative but to take stand and either explain or deny statement attributed to him).

 Therefore, the statement was hearsay and could not be admitted before petitioner testified unless an exception to the hearsay rule applied. As noted previously, the trial court ruled the statement was admissible under Rule 803(3), SCRE. Because petitioner does not appeal the trial court's ruling that the statement is a Rule 803(3) exception to the hearsay rule, that ruling is the law of the case.[9] *See State v. Forrester,* 343 S.C. 637, 541 S.E.2d 837 (2001) (unchallenged ruling, right or wrong, is law of the case). Accordingly, the trial court did not err by admitting Lynch's testimony.

## ISSUE V

Did the trial court err by commenting on the facts in his malice charge to the jury?

## DISCUSSION

Petitioner argues the court erred when charging malice to the jury. The court charged the jury:

Murder is defined as the unlawful killing of a human being with malice aforethought.... Malice may be either expressed as if it is stated in no uncertain terms ...

The malice does not have to exist for any appreciable period of time before the killing occurs. The malice may be conceived at the moment that the act occurs. But there must be a conjunction, that is a coincidence in time of the act, the guilty act and the state of mind. *Even if the*

---

9. In any event, the statement is admissible under Rule 803(3) because it is a statement of petitioner's intent to kill a police officer if an officer attempted to arrest him. *See State v. Garcia,* 334 S.C. 71, 512 S.E.2d 507 (1999) (statement must relate to present or look to future, but cannot look back to past condition).

*defendant had had malice at some point in the past he has not committed murder unless the malice actually existed at the time of the killing.*

*It may be expressed, malice can be expressed where there is manifested a deliberate intention to violently and unlawfully take the life of another human being. For instance with words.* Or it may be inferred, that is deduced by you from certain circumstances . . . .

One of the ways that malice can be inferred is from the use of a deadly weapon . . . .

The term deadly weapon means any weapon, device, instrument, material or substance which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury, that is what a deadly weapon is.

*Under the law of our State a pistol is a deadly weapon.* (Emphases added).

 Petitioner objects to the malice charge on the basis the court instructed the jury could find express malice where, by the use of words, there is manifested a deliberate intention to violently and unlawfully take the life of another. Petitioner argues this language comments on the facts of the case because the State was attempting to rely on prior statements by the defendant in an effort to show malice. *See State v. Jackson,* 297 S.C. 523, 377 S.E.2d 570 (1989) (trial court should refrain from all comment that tends to indicate to jury his opinion on credibility of witnesses, weight of evidence, or guilt of accused).

The charge given does not refer to *prior* statements. The trial court indicated malice could be expressed with words, that malice must *accompany* the physical act of killing, that there must be a coincidence in the guilty act and the state of mind, and that, "[e]ven if the defendant had . . . malice at some point in the past he has not committed murder unless the malice actually existed at the time of the killing." Further, the court instructed the jury that it was the sole arbiter of the facts and the credibility of the witnesses. Accordingly, the court's instructions to the jury when considered as a whole are not reversible. *See State v. Jackson, supra* (jury instructions must be considered as whole and, if as whole, they are

free from error, any isolated portions which might be misleading do not constitute reversible error).

Additionally, as stated in *State v. Jackson,* the test is what a reasonable juror would have understood the charge as meaning. It is unlikely that a reasonable juror would have singled out this portion of the charge and interpreted it as an opinion on the facts of this case or as an instruction as to the weight to be given the evidence.

Petitioner also objects to the court's statement that a pistol is a deadly weapon under South Carolina law as a comment on the facts of the case. However, under the law of South Carolina, a pistol is a deadly weapon. *See State v. Campbell,* 287 S.C. 377, 339 S.E.2d 109 (1985) (deadly weapon is generally defined as any article, instrument or substance which is likely to produce death or great bodily harm); *cf. State v. Heck,* 304 S.C. 345, 404 S.E.2d 514 (Ct.App.1991), *cert. denied,* 502 U.S. 1043, 112 S.Ct. 900, 116 L.Ed.2d 802 (1992) (BB gun found to be deadly weapon for purposes of armed robbery charge). Accordingly, the trial court properly charged the jury on the law, *i.e.* that a pistol is a deadly weapon for the purposes of inferring malice.

## ISSUE VI

Did the trial court err by commenting on the facts when explaining deadly force to the jury?

## DISCUSSION

Petitioner argues the court erred when explaining deadly force to the jury. The court charged the jury:

Examples of an act of provocation which would be sufficient would be an unprovoked assault. By the same token, the exercise of a legal right no matter how offensive to another is never in the law deemed a provocation sufficient to justify or to mitigate an act of violence. *That which is perfectly justifiable on the part of the deceased cannot in anyway [sic] be legal provocation to the slayer.*

*In that regard, a person, a law enforcement officer may use whatever force is necessary to effect the arrest of a felon including deadly force, if necessary, to effect that arrest.* (Emphases added).

 In general, the trial court is required to charge only the current and correct law of South Carolina. *State v. Burkhart,* 350 S.C. 252, 565 S.E.2d 298 (2002). A jury charge is correct if it contains the correct definition of the law when read as a whole. *Id.*

 The trial court correctly stated that an exercise of a legal right is never deemed a provocation sufficient to justify or to mitigate an act of violence. The trial court also properly charged that an officer may use whatever force is necessary to effect the arrest of a felon including deadly force to effect that arrest. *See Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (during felony arrest, if arresting officer has probable cause to believe suspect poses threat of serious physical harm, officer may prevent escape by using deadly force). This correct legal charge also conformed to the evidence in this case. *See State v. Brown,* 274 S.C. 48, 260 S.E.2d 719 (1979) (trial judge's inclusion of lack of consent was not impermissible charge on facts of case, but rather correct statement of law, in conformity with the evidence). Accordingly, the trial court did not err in his explanation of deadly force.

## CONCLUSION

We reverse the PCR court's decision to deny petitioner's request for a belated review of his direct appeal issues. After a review of petitioner's direct appeal issues, we affirm.

**REVERSE, GRANT BELATED REVIEW, AND AFFIRM.**

TOAL, C.J., WALLER and BURNETT, JJ., concur.

PLEICONES, J., not participating.